## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

CHRISTOPHER R. HARVEY )
)
Plaintiff, )
)
v. )           **COMPLAINT AND DEMAND FOR**
)               **JURY TRIAL**
)
MICHAEL J. CARL, MD; )
)
Defendant. )
)

## INTRODUCTION

1.      This medical malpractice lawsuit arises out of Defendant Dr. Michael J. Carl's unreasonable failure to recognize that his patient, Plaintiff Christopher Harvey, presented with classic red-flag symptoms of surgical myelopathy, a condition which required urgent surgical care.

2.      Dr. Carl's conduct resulted in a significant delay in the diagnosis of cervical myelopathy, and caused Mr. Harvey to suffer from permanent and significant disability.

## PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff Christopher R. Harvey is a resident of Tenants Harbor, Knox County, State of Maine.

4.      Defendant Michael J. Carl, MD ("Carl") is a resident of the State of Indiana.  The conduct alleged in this lawsuit arose while he was practicing as a licensed physiatrist in the State of Maine.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, because this is an action involving citizens of different states and the matter in controversy exceeds $75,000.

6.       Venue is proper in the District of Maine pursuant to 28 U.S.C. §1391, because a substantial part of the events or omissions giving rise to this claim occurred in the State of Maine.

7.       On January 3, 2023, Plaintiff filed a Notice of Claim pursuant to the Maine Healthcare Security Act against Defendant Carl and another physician, Dr. Alexander Mesrobian, and their respective medical practices.  Plaintiff resolved his claims against all defendants other than Defendant Carl prior to the panel proceeding.  Plaintiff and Defendant Carl then mutually agreed to waive the panel proceeding.

### FACTS

8.       On June 9, 2021, Plaintiff Christopher Harvey ("Chris"), then age 36, was carrying a large industrial fan on his shoulder in the course of his employment at Bath Iron Works when he fell forward, striking his face and left temple against a metal structure.

9.       As a direct consequence of this trauma, Chris began suffering from progressively worsening symptoms of cervical myelopathy caused by compression of his cervical spinal cord.

10.       Chris's new-onset symptoms included pain, numbness and tingling in his upper extremities, and weakness in the right hand.

11.       Chris's spinal compression required urgent surgical treatment.  Chris's providers, including Dr. Carl, were aware that untreated progressive cervical myelopathy can lead to permanent disability, even death.

12.       If cervical myelopathy is within the active differential diagnosis of a patient like Chris, the standard of care requires that an MRI be performed in a timely fashion to confirm or exclude this condition.

13.    On June 17, 2021, following his accident, Chris saw Dr. Alexander L. Mesrobian at Occupational Health Associates, at which time he was wobbly on his feet and had an abnormal gait.

14.    On August 5, 2021, Chris had an office visit with Dr. Mesrobian at which time Dr. Mesrobian noted that Chris had not had normal feeling or strength in his right hand since the time of his June injury and wrote as follows:  "[I]f he does not improve, or gets worse, we may consider additional testing which might include imaging of his neck or a nerve conduction test."

15.    A nerve conduction study is not an appropriate method to exclude cervical myelopathy.

16.    On August 24, 2021, Dr. Mesrobian noted that Chris's entire right hand was "numb, all five digits, and this came about right after the work-related incident." He also noted that Chris complained that his right hand was not as strong as his left and he was dropping things.

17.    Dr. Mesrobian also observed that Chris had a positive Hoffman sign, which he understood was an indication of a neurological problem originating in the cervical spine.

18.    Although the standard of care required that Chris receive an MRI at that time and/or referral to a spine surgeon, Dr. Mesrobian instead referred Chris to Dr. Carl.

19.    Dr. Carl is a physiatrist with board certification and specialties in Pain Management and Electrodiagnostic Medicine.

20.    Dr. Mesrobian referred Chris to Dr. Carl for a consultation and EMG, not an MRI, to "localize" the diagnosis.  At the time he referred Chris to Dr. Carl, and possibly even today, Dr. Mesrobian was not aware of a critical fact: In Chris's situation, an EMG was of no value in eliminating the possibility of serious cervical myelopathy.  Only an MRI would suffice, Chris urgently needed one.

21.     Nonetheless, Dr. Carl accepted the referral.  He treated Chris and performed an EMG pursuant on September 3, 2021.  At the time of his examination and the EMG study, the relevant details of Chris's condition were available to Dr. Carl, either by conversation with Dr. Mesrobian, or by review of the medical records, or by both.

22.     Dr. Carl failed to conduct an appropriate neurological examination, which the standard of care required.  For example, he did not observe Chris's abnormal gate, he did not repeat the testing for a Hoffman's sign, he did not test for lower extremity reflexes, and he did not test Babinski reflexes.

23.     If Dr. Carl had performed an adequate neurological examination or review of Chris's medical history, he would have realized that progressive cervical myelopathy remained in Chris's active differential diagnosis and that he required an urgent MRI to establish or exclude this possible diagnosis.

24.     In fact, at the time of his examination by Dr. Carl, Chris was suffering from progressive cervical myelopathy in the C4 region of his neck.  Not only did Dr. Carl fail to recognize the urgent need to escalate his care to rule out or confirm that condition, but he also affirmatively indicated that it was not a concern.  Following the EMG, Dr. Carl reported, in relevant part, that there was *"no electrodiagnostic evidence of cervical myelopathy…neuropathy or myopathy on this investigation."*

25.     Dr. Carl's treatment, medical notation, and recommendations did not meet the standard of care.  Dr. Carl knew at the time of his treatment that the EMG was of no diagnostic value whatsoever in considering myelopathy in any region of the neck above C6-C7, including C4.

26.     Based on the report of Dr. Carl, Dr. Mesrobian was falsely led to believe that Chris's symptoms were entirely explained by a "brachial plexus stretch on the right," and that cervical myelopathy could be eliminated from his active differential.

27.     In accepting Chris as a patient, Dr. Carl knew or should have known that the sole purpose of Dr. Mesrobian's referral was to solicit Dr. Carl's help in determining the cause of Chris's neurologic deficits and that Dr. Mesrobian would rely on Dr. Carl's expertise in developing a treatment plan for Chris.  Furthermore, Dr. Carl endorsed Dr. Mesrobian's dangerous disregard of the possibility of cervical myelopathy when he specifically approved of Dr. Mesrobian's inclusion of chiropractic treatment and physical therapy in Chris's treatment plan.  These were dangerous in the context of Chris's presentation, and more likely than not contributed to his injury.

28.     As a result of Dr. Carl's failure to identify cervical myelopathy as a potential cause of Chris's symptoms and his misleading statement indicating that cervical myelopathy had been excluded, Dr. Mesrobian delayed Chris's referral to a neurosurgeon and subjected Chris to inappropriate medical care, including cervical manipulation.

29.     If Chris Harvey had received an MRI at some reasonable time after his September 3, 2022, visit, it would have revealed progressing cervical myelopathy and led to a surgical intervention that would have resulted in a much better outcome.  For example, at the time of his evaluation by Dr. Carl, Chris had negligible, if any, deficits in his left arm.  Today and for the remainder of his life, Chris has substantial preventable impairment of his left arm.

30.     Likewise, at the time of his examination by Dr. Carl, Chris had yet to experience profound bi-lateral leg weakness, which he later did.  Today, and for the remainder of his life, he suffers from profound neurologic injuries to his left leg and left arm, injuries which were not

present when he was examined by Dr. Carl and which would have been prevented if Dr. Carl had followed the standard of care.

31.     Because of the defendant's false suggestion to Dr. Mesrobian that Plaintiff did not suffer from cervical myelopathy, Chris Harvey continued to work and continued to receive chiropractic spinal manipulations.  He did not receive an MRI until April 14, 2022.

32.     By the time Chris Harvey finally received an MRI on April 14, 2022, he was experiencing bilateral neurological symptoms, including numbness and weakness, in his upper and lower extremities.

33.     Chris received excellent medical care after his MRI, which included urgent spinal cord decompression surgery.  Unfortunately, this care was too late to prevent or reverse Chris's profound neurologic injury. These neurologic injuries not only cause Chris to experience pain, but they have also deprived him of the ability to work and have substantially impacted the quality of his life.

34.     As a result of Dr. Carl's failure to recommend that Chris receive an MRI, his negligent communication which falsely assured Dr. Mesrobian that cervical myelopathy had been excluded, and his endorsement with Dr. Mesrobian's treatment plan, Chris will permanently suffer from physical disability and pain.

## COUNT I
### (NEGLIGENCE)

35.     Plaintiff Christopher Harvey repeats and realleges the above allegations as if set forth herein in full.

36.     Dr. Carl had a duty to provide reasonable medical care and treatment to Chris Harvey.

6

37.     Dr. Carl failed in his duty and committed negligence by deviating from the standard of care for reasonable medical providers.

38.     Dr. Carl's negligent breaches from the standard of care include:

a.  Failing to conduct an appropriate neurological examination of Mr. Harvey, including examination of lower extremity reflexes;

b.  Failing to carefully review Mr. Harvey's medical records and history;

c.  Failing to refer Mr. Harvey for urgent MRI given his history and presentation;

d.  Leading Dr. Mesrobian to believe that that the EMG had ruled out cervical myelopathy, even though Dr. Carl knew that it had not done so;

e.  Recommending that Mr. Harvey continued in his current course of treatment, including chiropractic manipulation of cervical spine, physical therapy, and modified labor;

39.     As a direct and proximate result of Dr. Carl's negligence, Plaintiff suffered severe pain, injury, loss of enjoyment of life, emotional distress, medical expenses, lost earning (capacity and permanent impairment.

WHEREFORE, Christopher Harvey requests that judgment be entered in his favor against the Defendant for damages which this Court deems reasonable, together with interest and costs.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues in this Complaint.

Dated:   September 4, 2024

By:      */s/ Terrence D. Garmey, Esq.*
Terrence D. Garmey, Esq., Bar # 1656
Alexis Garmey Chardon, Esq., Bar #5932
*Counsel for Plaintiff*

GARMEY LAW
482 Congress Street, Suite 402
Portland, Maine 04101
Telephone: (207) 899-4644

achardon@garmeylaw.com

8